IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RICHARD WILLIAMS, | CIVIL DIVISION |
| Plaintiff, | Case No. |
| v. | |
| MEADOWS PSYCHIATRIC HOSPITAL, | |
| Defendant. | |

## COMPLAINT AND JURY DEMAND

A. *Preliminary Statement*

1. The plaintiff Richard Williams brings this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* to redress violations of his right to be free from employment discrimination, harassment and retaliation based upon his race. Because of the violations described herein, this Court is also empowered to exercise pendant jurisdiction pursuant to the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951 *et seq.* A jury trial is demanded.

B. *Jurisdiction*

2. The jurisdiction of this Court is invoked pursuant to 42 U.S.C. § 2000e *et seq.*, 28 U.S.C. § 1331 and under the doctrine of pendant jurisdiction.

3. On or about December 6, 2021, the plaintiff filed a timely charge alleging discrimination with the Equal Employment Opportunity Commission ("EEOC"), docketed at 533-2022-00467. This charge was simultaneously cross-filed with the Pennsylvania Human Relations Commission.

4. The EEOC issued a Notice of Right to Sue dated June 13, 2022.

5. This Complaint is filed within 90 days of receipt by the plaintiff of the Notice of Right to Sue.

C. **<u>The parties</u>**

6. The plaintiff is an adult individual who resides in Bellefante, PA (Centre County).

7. The defendant Meadows Psychiatric Hospital ("Meadows") is an entity doing business in the Commonwealth of Pennsylvania. At all times material, the defendant had a place of business located at within this district, specifically 132 The Meadows Drive, Centre Hall, Centre County, PA 16828.

8. The defendant is inpatient treatment facility providing care to children, adolescents and adults and is designed to help patients stabilize from acute symptoms of mental health disorders.

9. At all times material, the defendant employed more than fifteen employees.

10. The defendant was the plaintiff's employer and is an employer within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e(b).

D. **<u>Factual Background</u>**

11. The plaintiff Richard Williams was employed by Meadows from July 20, 2020 through September 9, 2021.

12. The plaintiff was employed as a Mental Health Technician. His responsibilities included monitoring patients, assuring their safety and mental comfort, de-escalating situations involving and/or restraining patients as necessary, assist with patients' activities of daily living, assisting nurses, preparing for new patient intake and paperwork.

13. The plaintiff performed all of the functions of his job in a competent fashion and was considered to be a good worker.

14. While he was an employee, the plaintiff was subjected to discriminatory comments and treatment by his co-workers and managers on account of his race (African American). Some examples follow:

(a) After an incident where one of the patients called the plaintiff a nigger, Kim Hummel, Technician, told the plaintiff that he should not be upset by it. She said, "It's just a word." She told the plaintiff that he should have a thicker skin and then started using the word "nigger" in every one of her sentences like she was trying to hit a "nigger word count." She capped off this "session" by claiming that she understood discrimination because she got picked on in elementary school for being a red head. She also told the plaintiff that "everyone here" is a Trump supporter and it would be best if he kept his support of Black Lives Matter and other "liberal ideas" to himself.

(b) Meadows tolerated patients' racist outbursts. Many patients called the plaintiff a nigger if they were unhappy. On one occasion, for example, a patient was angry with the plaintiff because the plaintiff would not shut the patient's door. The plaintiff had been disciplined for closing patient doors (see below) and advised the patient that he was not permitted to do so. The patient started yelling in a loud voice, "shut the fucking door and stop being a nigger about this!" Other co-workers intervened. Instead of instructing the patient to refrain from using racial epithets, one co-worker asked the patient what the *plaintiff* had done to get him so upset.

(c) A phlebotomist consistently referred to the plaintiff as "that black guy" even through he had told her his name several times. She often spoke disparagingly about the Black Lives Matter movement and was a vocal supporter of President Trump during the election season. On one occasion, the plaintiff overheard her complaining that "Biden is giving that black guy over there [referring to the plaintiff] money to start a farm and I can't get it because I'm white."

(d) Jean Firarro-Thiebeault, Nurse, routinely called the plaintiff, "boy" or "home boy." He repeatedly asked her to stop, but she refused, telling the plaintiff that she wasn't being "racial". She seemed to enjoy making the plaintiff feel uncomfortable and considered it a funny jest.

(e) Co-workers accused the plaintiff of being "lazy", "dishonest" and "stupid", all thinly veiled derogatory references about his race, i.e., all black people are lazy, dishonest and stupid. On one occasion, for example, Firraro-Thiebeault made these comments to the plaintiff in the presence of a patient that they were processing. The patient pulled the

        plaintiff aside afterwards and asked, "Does she always say all that racist ass shit to you?"

    (f)    Rumors were started and spread that the plaintiff was a "player" and was sexually involved with several female employees, again racially tinged comments implying that all black men "sleep around".

    (g)    Several co-workers referred to the plaintiff by his race on a regular basis, constantly "reminding" him that he is a black man; they would not greet or interact with him normally.

    (h)    Several co-workers regularly expressed "surprise" that the plaintiff "did not sound like" or "talk like" a black man.

    (i)    The racial animus at Meadows was not limited to just the plaintiff but was a pervasive feature of the company's culture. For example, Cassandra Hauser, Med Nurse, told the plaintiff that she did not like a black female doctor because she was "too ghetto". Hauser also made comments about the doctor's hairstyle, locs. Hauser said that the doctor's locs showed that she was "ghetto".

15.    The plaintiff was treated differently than similarly situated Caucasian employees and his work was subjected to heightened scrutiny by management. Some examples follow:

    (a)    The plaintiff was disciplined for closing patients' doors from time to time when he left their room. Adrianne Robinson, Unit Nurse Manager, told the plaintiff that a camera had "caught" him closing a patient's door and that it was against company policy. She said that he was going to be given a warning and, that if he did it again, he would be disciplined. Similarly situated white co-workers told the plaintiff that they closed patients' doors on a regular basis and that they had never been "warned" or disciplined about it.

    (b)    Robinson disciplined the plaintiff for using his phone during work on one occasion. She yelled at him, "I don't ever want to see it out again!" Other similarly situated white employees regularly used their phone during work without being disciplined.

    (c)    On one occasion, the plaintiff put a box of crackers on the floor behind a desk to keep it hidden from a patient who had an eating disorder. When Robinson found out, she disciplined the plaintiff for doing so, saying that "food should never be placed on the floor." Similarly situated white employees were not disciplined for this "infraction", in fact, many were surprised and told the plaintiff that they had never heard of such a rule.

(d)     The plaintiff was unable to complete a training module because he was having trouble logging into the system. Robinson called the plaintiff into her office and told him that he had to do the training and that he would have to be pulled off the schedule for failure to complete the training. Similarly situated white employees who had not timely completed the training were not called into meetings to be reminded to complete the training or threatened with being taken off the schedule.

(e)     The plaintiff completed the training module a week late after finally resolving his inability to log into the system. At the time of the next mandatory training, a supervisor put a note on the staff lounge door, singling out the plaintiff: "Richard, complete the online training." Some of the similarly situated white employees had yet to complete the training that the plaintiff had finished, yet they were not singled out.

(f)     Robinson disciplined the plaintiff for clocking in three minutes early. She told the plaintiff that he ran the risk of being written up and terminated if he kept clocking in early. The plaintiff pointed out that he clocked in just three minutes early. She said that it was better that he was late coming back from lunch than early. Similarly situated white employees were not disciplined for returning to work from lunch a couple of minutes early.

(g)     Kathy Van Scyoc, Night Shift Supervisor, made it a point to write up the plaintiff every time that he was late arriving at work, even if it was only by a couple of minutes. In her supervisor notebook, there were several write up receipts and a notation that the plaintiff was "chronically late." Next to a coworker's name, who was late every single day (and who had told the plaintiff, "I will never be on time for this fuckin' job"), there were no write ups.

(h)     As part of the routine during his shift, the plaintiff pulled the dirty linens hamper out of the closet at 6:00 a.m. Robinson yelled at the plaintiff that the hamper being out was a hazard and that he should not have left it out "all night." The plaintiff said that he had just taken it out, like he always does at this time. Robinson accused him of lying and to put it away "NOW". As he went to move it, a patient ran out of his room and asked him to wait a second so that he could put in some wet towels because his bathroom had flooded. The plaintiff stood by the hamper as the patient went to get the wet towels. Robinson came from the nurse's station very angry, yelling, "When I tell you to do something, you DO IT RIGHT NOW!" The plaintiff told her that he was waiting for a patient. Robinson accused the plaintiff of lying about that as well. A similarly situated white co-worker told the plaintiff that she left the hampers out all night on a regular basis and that she had never been accosted for doing so.

5

   (i) In July 2021, the plaintiff was pulled off the floor and taken to a side office with Robinson and Kim Tate, human resources manager. They had prepared a calendar detailing every single day that he was more than 8 minutes late. They warned him that this was his final warning and, per the old attendance policy, if he was late one more time, he would be terminated. The plaintiff pointed out that there was a new attendance policy that had been put into effect, and, per that policy, he did not have anywhere enough points to be fired. Robinson and Tate said that the new policy "did not apply to him" and that this was his final warning. Similarly situated white employees' attendance was not subjected to such scrutiny.

16. After the incident with the hamper (referred to above), the plaintiff went to Human Resources to raise issues about how Robinson and the staff were treating him. He met with Maria Mann. He told Mann about Robinson's tone, how she treated him differently than other employees and how he was constantly being caught in camera reviews and his co-workers were not. He also told Mann about how he was treated and talked to by the staff.

17. A couple of weeks later, the plaintiff was pressured to give the names of the nurses that had made racist comments and to give a written account of what happened. At this point, the plaintiff was very concerned about retaliation and reprisal, so he put together his report with that in mind.

18. The plaintiff heard nothing more about the issue from Mann and HR. He did not know if any investigation was conducted. In any event, his situation at work did not get any better.

19. A co-worker asked the plaintiff to take his shift for Friday, September 3, 2021. The plaintiff agreed to do so but forgot to set his alarm accordingly. He ended up sleeping in and reported to work about 45 minutes late.

20. That day, he went to HR and talked to Mann to request being assigned to the 3 pm to 11 pm shift at Robinson's recommendation. Mann told the plaintiff that she didn't know

whether a position like that would be available but that she would "look into it" and see what he could do.  The plaintiff did not hear back from Mann or anyone else about the position prior to his termination.  Another co-worker asked for that shift after the plaintiff's termination and was reassigned with no issues.

21. On September 9, 2021, the plaintiff was called to HR and met with Robinson and Tate.  He was told that his employment was being terminated due coming in late the previous Friday.  The plaintiff tried to explain why he should not be fired, but to no avail.  Tate told him that HR had no choice, "this is the policy."  Tate mockingly asked him why he was asking for *special* treatment.

22. The reason given for the plaintiff's termination was nothing more than a pretext. Similarly situated white employees were not fired for far worse attendance infractions.  The real reason that he was fired was on account of his race.

### FIRST CAUSE OF ACTION

23. The preceding paragraphs are incorporated herein by reference as if they were set forth at length.

24. The plaintiff is African American and thus is protected against discrimination, harassment and retaliation on the basis of his race pursuant to Title VII.

25. The plaintiff was qualified for his position.

26. Despite his qualifications, the plaintiff was terminated.  The reasons given for his discharge were a pretext.

27. The defendant's discharge of the plaintiff was because of his race in violation of Title VII.

28. The defendant's violation of Title VII was committed with intentional or reckless disregard for the plaintiff's federally protected right to work in an environment free of race discrimination.

## SECOND CAUSE OF ACTION

29. The preceding paragraphs are incorporated herein by reference as if they were fully set forth herein.

30. As a direct and proximate cause of its actions, detailed above, the defendant has violated the plaintiff's right to be free from discrimination and harassment under the Pennsylvania Human Relations Act, 43 Pa. C.S.A. § 951 *et seq.*

WHEREFORE, the plaintiff respectfully requests judgment be entered in his favor and against the defendant and that the defendant be required to provide all appropriate remedies under Title VII and the PHRA, including attorney's fees and costs.

Respectfully submitted,

*/s/ Jordan Wartman*

Jordan Wartman
Pa. I.D. No. 323396
Edgar Snyder & Associates
200 Grandview Ave., Suite 100
Camp Hill, PA 17011
(717) 912-5601

Michael J. Bruzzese *(Admission pending)*
Pa. I.D. No. 63306
220 Koppers Building
436 Seventh Avenue
Pittsburgh, PA 15219
(412) 281-8676
Counsel for the plaintiff

Dated: August 31, 2022